JS 6

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ronald A. Guzman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 97 C 4872 | **DATE** | 3/19/2001 |
| **CASE TITLE** | | CASEY GABLE, et al vs. THE CITY OF CHICAGO | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER: Defendant's motion to strike is denied [63-1]. Plaintiffs' motion to strike is granted [70-1]. Plaintiffs' motion for summary judgment is denied [53-1] and Defendant's cross motion for summary judgment granted [59-1]. Judgment is entered in favor of Defendant. The captioned case is hereby ordered terminated upon the docket record of the United States District Court for the Northern District Division.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | | Document Number |
|---|---|---|---|---|---|
| | No notices required. | | | number of notices | |
| | Notices mailed by judge's staff. | | | | |
| | Notified counsel by telephone. | | | MAR 2 0 2001 | |
| ✓ | Docketing to mail notices. | | | date docketed | 81 |
| ✓ | Mail AO 450 form. | | | 15 | |
| | Copy to judge/magistrate judge. | | | docketing deputy initials | |
| | | | | | |
| | TBK | courtroom deputy's initials | | date mailed notice | |
| | | | | Date/time received in central Clerk's Office | mailing deputy initials |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MAR 2 0 2001

CASEY GABLE, et al.,     )
     )
     )
     )
     )
Plaintiffs,     )
     )     No. 97 C 4872
v.     )     Judge Ronald A. Guzman
     )
     )
THE CITY OF CHICAGO     )
     )
     )
     )
     )
Defendant.     )

## MEMORANDUM OPINION AND ORDER

Pending is Plaintiffs' motion for partial summary judgment pursuant to Fed. R. Civ. Proc. 56 as well as Plaintiffs' motion to strike portions of the City's Rule 56.1 statement. Also pending is Defendant's cross motion for summary judgment pursuant to Fed. R. Civ. Proc. 56. and Defendant's motion to strike portions of Plaintiffs' 56.1 statement and Gorman's affidavit offered in support of Plaintiffs' Local Rule 56.1 Statement. For the reasons set forth below Defendant's motion to strike is denied (#63-1), Plaintiffs' motion to strike is granted (#70-1). Plaintiffs' motion for summary judgment is denied (#53-1) and Defendant's cross motion for summary judgment is granted (#59-1).

## I. INTRODUCTION

Plaintiffs' one-count second amended class action complaint pursuant to 42 U.S.C. § 1983

81

alleges that the City of Chicago ("City") is liable for numerous incidents of damage, including theft and vandalism, and in some instances total destruction which occurred to Plaintiffs' vehicles while impounded at one of the City of Chicago's Auto Pounds ("Pounds") from July 1995 to May 1999. Plaintiffs claim that the City deprived them, and other similarly situated individuals, of their property without due process of law in violation of the Fourteenth Amendment by turning a blind eye to the pervasive corruption at Pound 6.

## II. BACKGROUND FACTS

Over the five year period involved in this lawsuit the City towed approximately 182,000 vehicles and it is undisputed that the City has in place an integrated system of policies and procedures which has been set up in connection with the towing of vehicles. First, we will describe the policies and procedures that City has in place in connection with the towing process in the City. Next, we will describe what happened to Plaintiffs' vehicles as part of this towing process to determine whether the City had a different municipal custom with respect to Pound 6.[1]

**TOWING AND IMPOUNDMENT AUTHORITY OF THE CITY**

The City of Chicago Municipal Code ("Code") authorizes the City to tow and impound motor vehicles under four general circumstances. The City is authorized to boot and tow a vehicle when the owner has accumulated over five unpaid parking tickets ("Scofflaw Tow"). The City may tow vehicles

---

[1]Contrary to indications in Plaintiffs' brief, this Court does not use the terms "policy" and "custom" interchangeably when conducting a *Monell* analysis. Rather, a "policy" is an official policy, a deliberate choice of guiding principles or procedure made by the municipal official who has final authority regarding such matters. *See Ware v. Jackson County,* 150 F. 3d 873, 880 (8th Cir. 1998). Plaintiffs have not identified any official policy that arguably played a role in the damage, theft and destruction of their vehicles. Therefore, we must determine whether Plaintiffs have come forward with evidence from which a jury could reasonably find the existence of a municipal custom as to vehicles towed to Pound 6.

it determines to be abandoned. The City may also tow vehicles parked in an unauthorized area of the public way allowing for immediate towing, or in any other cases where an emergency arises necessitating the immediate removal of a vehicle upon any public way. Examples of Immediate Tows include when a vehicle is marked in an area of the public way marked "tow zone," where the vehicle is found to constitute a hazard, or where a vehicle is parked in a snow route. A fourth type of tow is when a vehicle is involved in a violation of a quasi-criminal Code Ordinance that authorizes immediate seizure and impoundment. Examples of Criminal Tows include firearms, fly-dumping, narcotics, curfew, solicitation of prostitution, and noise.

## DESCRIPTION OF POUND 6

The City maintains several auto pounds used to store vehicles towed in the City including pounds 1,2,3,4 and 6, and the Central, O'Hare pounds. Pound 6 is located on Chicago's West Side at 701 N. Sacramento Avenue. The Pound covers an area equal to approximately 5 square city blocks. Pound 6 is bounded on the west by Sacramento Avenue, on the north by the Metra railroad tracks, on the south by a Metra gravel yard and additional Metra tracks used for maintenance, and on the east by Rockwell Avenue. The Pound has room for approximately 3,100 vehicles.

There is only one entrance to the pound where vehicles can enter and exit, and it is located at the far west side of the Pound, just off Sacramento Avenue. Near this entrance is a trailer from which Pound personnel manage the Pound and where vehicle owners come to redeem and pay for their vehicles. At the front or far west area of Pound 6 that is, the area most easily accessible from the public way, is a chain link fence 12' high. Most of the back (or eastern part) of the Pound is not easily accessible by the public because it is bounded by Metra railroad tracks. Along these railroad tracks, the eastern side of the Pound is enclosed by berms that are approximately 5' high. On the far eastern

side of the Pound, adjacent to Rockwell, the Pound is enclosed by a berm that is approximately 25' high.

Pound 6 accepts vehicles towed mostly from the north side of the City, including vehicles located within at least thirteen (13) Police Districts. From 1995 through 1999, the total number of vehicles towed to Pound 6 was approximately 181,911 and, as classified by calendar year: (1) in 1995, 31,730; (2) in 1996, 32,900; (3) in 1997, 34,350; (4) in 1998, 41,124; and (5) in 1999, 41,807. Prior to 1991, the Chicago Police Department had responsibility for operation and management of the City's Pounds. Beginning in 1991, the Department of Streets and Sanitation ("S&S") took over responsibility for the operation and management of all Pounds, except for Pounds 1 and 4, to which vehicles are towed that were involved in crimes or otherwise are held for the purpose of recovering evidence.

Beginning in 1996, S&S began privatizing the operation and management of certain Pounds by entering into contracts with a company named Environmental Auto Removal, Inc. ("EAR"). In August 1997, S&S entered into a contract with EAR for, among other things, the operation and management of Pounds 2,3 and 6. Currently, EAR is still under contract with the City for the operation and management of these Pounds.

## CITY TOWING AND IMPOUNDMENT POLICES AND PRACTICES

Many of the City's policies and practices relating to towing and impoundment of vehicles are stated either in the Municipal Code, or in a document entitled "Department of Streets and Sanitation, Bureau of Traffic Services, Auto Pound Procedure Manual" ("Procedural Manual"). This Procedure Manual was created in 1997, when EAR took over the operation of the Pound. Under the contract, EAR is required to comply with all City towing and impoundment policies and procedures, including but not limited to those contained in the Code, the Contract, and the Procedure Manual. Unless

4

explained otherwise, the City policies and procedures described below are identical to those used by EAR in operating Pound 6.

The Municipal Code requires the City to create and maintain accurate records of all vehicles towed and impounded that contain all relevant information about the tow from when the vehicle was first identified to be towed to when the vehicle is either released to the owner or disposed of by the City. One of these records is a tow report authorizing that a car be towed ("Tow Report"). A Tow Report is created at the time the official requesting the tow observes the vehicle and determines that towing is proper. The person completing the Tow Report is required to conduct a general inspection of the exterior of the vehicle as well as a limited visual inspection of the interior to be towed and then to complete the Tow Report by describing the reason the vehicle was towed, the vehicle make, model and identification number, and the condition of the vehicle at the time of the tow. After a Tow Report is created, the tow request is communicated to a-central dispatching system; operated by S&S, which is responsible for ensuring that the vehicle is towed by the City. Depending on the reason for the tow and the towing resources available, the vehicle may remain on the street for several hours or days before it is towed to the Pound.

When a two truck arrives to tow a vehicle, the driver will rely on the Tow Report to verify the identity of the car to be towed and will tow it to the designated City Pound. Generally, the driver picks up the car at the location it was first observed when the Tow Report was prepared. If, however, the car was part of a Criminal Tow, the police officer has discretion to, and often does, drive it first to the police station, from which the tow truck will then remove the vehicle for impoundment.

When a vehicle arrives at a Pound, Pound personnel (i.e until July 1997, City employees, and since July 1997, EAR employees) conduct a physical examination of the exterior of the vehicle as well

5

as a limited visual inspection of the interior of the vehicle and complete a Motor Vehicle Inventory Report, which is a consecutively numbered multi-part duplicate form. The Inventory Report contains similar information as the Tow Report, except that is describes the condition of the vehicle at the time it arrives at the auto Pound. In addition, the Inventory Report is used: (1) to describe the specific row and position within the auto Pound where the vehicle is parked, (2) to identify when the vehicle was redeemed and by whom, and (3) if the vehicle was never redeemed, it describes the manner and date upon which the vehicles was disposed. After completion of the top portion of the Inventory Report, the tow driver then parks the vehicle in the Pound.

After the vehicle is parked inside the Pound, the Inventory Report, along with the Tow Report, is returned to the Pound Office, where Pound personnel perform several tasks. For example, Pound personnel enter relevant vehicle information into the computer system, known as the "Hot Desk System." This computer system allows the City to track the location and disposition of all towed vehicles in the City and to respond to oral inquiries by vehicle owners about the status and location of their vehicles. Pound personnel also utilize a computer system to access the Secretary of State's vehicle registration information, to identify the registered owner of the vehicle, and to complete the section of the Inventory Report requiring the identity and address of the vehicle's owner. In addition to this data entry, similar information is entered into a daily log book ("Daily Log") that is kept at the Pound.

Despite the above log system Plaintiffs claim that the City has a custom of denying to vehicle owners that their cars have been towed to Pound 6, even though its agents knew or should have known that the vehicles are in fact located at Pound 6. Plaintiff Casey Gable's car was towed on or about January 11, 1997 and on numerous occasions Gable contacted Pound personnel who denied knowledge

of the whereabouts of her car. After a two week period had elapsed Ms. Gable contacted an acquaintance who worked at another City Pound who verified that the car had in fact been towed to Pound 6.

On December 17, 1996 Plaintiff Greg Moore's car was removed from a private driveway where Moore had dropped his car off for repairs. The driver who towed Moore's car told the car shop owner that the car was being towed to Pound 6. For three weeks Moore attempted to locate his vehicle and was told on numerous occasions by Pound personnel and the Chicago Police Department that his car was not at Pound 6. On or about January 18, 1997, a Chicago Police Department Sergeant, after listening to Moore's plea to find his vehicle located the vehicle at Pound 6. When Moore went to retrieve his vehicle Moore was told by Pound personnel that the car had been crushed on January 21, 1997.

Plaintiff Gene Floriani had his vehicle towed on or about April 3, 1997. Initially when he contacted Pound 6 he was told it was not there. Two or three days later Floriani received a call from the Chicago Police Department informing him that his vehicle was at Pound 6. When he arrived at the Pound he found that his car had been stripped.

## NOTICE OF TOW

For certain types of tows, such as tows of vehicles either abandoned or where a number of parking tickets are owed by a vehicle owner ("Scofflaw Tow"), the City provides the vehicle owner with notice of the tow and an opportunity to challenge the tow, prior to the tow. Regardless of whether pre-tow notice and a hearing is provided, the City provides post-tow notice for every vehicle towed. The Municipal Code requires the City to send out a "Notice of Impoundment" ("Notice") within 10 days of the vehicle's impoundment. The Notice must provide a description of the vehicle, when the

vehicle was towed, the reason for the tow, and the location of the Pound to which the vehicle has been towed.

If the vehicle is registered with the Illinois Secretary of State, the Notice must be sent to the owner and any other person legally entitled to possession of the vehicle. If the vehicle is not currently registered with the Secretary of State, the Notice must be sent to the most recent registered owner at the most recent registered address. In addition, the Notice must provide a description of the vehicle, when the vehicle was towed, the reason for the tow, and the location of the Pound to which the vehicle has been towed. Responsibility for sending out Notice is divided among different City Departments. For all Criminal Tows, the Revenue Department is responsible for sending out the required notice. Two separate Notices are provided in a Criminal Tow. First, the driver of the vehicle receives from the arresting officer, a document entitled "Notice of Impoundment" which explains all the circumstances of the tow, the fact that the vehicle will be impounded at a City auto Pound, all relevant information concerning the release of the vehicle, and the owner's right to a hearing, and that the City may dispose of the vehicle if it is not redeemed within 30 days after judicial review is exhausted. In addition, to providing the Notice of Impoundment described above, the Department of Revenue sends out a "Notice of Hearing" to all record owners of vehicles subject to a Criminal Tow. The Notice of Hearing again informs vehicle owners of the circumstances of the tow, the right to a hearing, how the vehicle may be redeemed, and the circumstances under which the City will dispose of the vehicle. The Department of Revenue sends out this notice within 10 days of impoundment. For all City tows to Pound 6 other than Criminal Tows, the Police Department, and S&S has been responsible for sending out the required Notices. Since August of 1999 when S&S took over responsibility from the Chicago Police Department for providing Notice, it followed the same practice as the Chicago Police

Department of sending out the Notices as required under the Code.

Plaintiffs allege that the City has a custom or practice of failing to timely notify vehicle owners that their cars have been towed to Pound 6. Casey Gable's car was towed on January 11, 1997, and written notice was sent to her address of record on January 14, 1997. Gable did not receive the notice because it was sent to her prior address. Gable had moved without notifying the Illinois Secretary of State of her new address. Greg Moores car was towed on December 21, 1996, and written notice was sent to his address of record on December 27, 1996, with the street name misspelled as "Farell" instead of "Farwell" but all other information correct. Moore did not receive his tow notice because he had moved without notifying the Illinois Secretary of State of his new address. Francine Gladney's car was booted on July 31, 1996, and towed on August 3. At the time the car was booted, a written notice was affixed to the car. After the tow, a written notice was sent to Gladney on August 6, 1996. Gladney admitted in her deposition that she saw and reviewed the sticker affixed to her car, and received and reviewed the mailed notice. Gene Floriani's car was towed on April 3, 1997, and written notice was sent to his address of record on April 11, 1997. Plaintiffs deny that Floriani received the notice, but they do not dispute that it was sent.

Brian Johnson's car, which had been stolen, was recovered and impounded on April 4, 1997. The City sent written notice to Johnson at his address of record on April 4, 1997. Johnson did not receive the notice because, as he admitted at his deposition, he had moved without notifying the Illinois Secretary of State of his new address. Ralph Bennett's car, was towed on November 25, 1998, and retrieved six days later, within the ten days which the City has to send out notice. Melinda Dimond's car was towed on August 20, 1999, and retrieved four days later, within the ten days which the City has to send out notice. Lanyea Wilson's car which had been stolen on January 25, 1999, was

recovered late in the evening of Friday, January 28 and impounded for narcotics in the early hours of

Saturday, January 29. Wilson was given a written notice of her right to a hearing on February 1,1999.

## LOCATING A TOWED VEHICLE

Two methods are generally available for a vehicle owner to locate a towed vehicle. First, as described

above, the Notice tells the owner, among other things, the location of the Pound where the vehicle can

be retrieved. The owner can also locate a towed vehicle, before receiving the Notice, by contacting

any number of City departments, including but not limited to, the Chicago Police Department or S&S

or any of the Pounds. Personnel at both of these Departments are trained to use the Hot Desk System

to locate any towed vehicle in the City. Generally, as long as the owner can identify either the license

plate number or the VIN, City personnel can easily locate the vehicle and inform the owner of its

location.

On certain occasions, an owner may have difficulty locating his vehicle. Ordinarily, this occurs

because the license plate or VIN were inadvertently entered into the Hot Desk System in error, or the

owner does not provide City personnel with the correct license plate or VIN. On the rare occasion that

a Hot Desk System cannot locate a vehicle, Pound personnel are trained and required to exhaust all

available means to locate it. For example, if a vehicle is suspected to have been towed to Pound 6,

Pound personnel are required to search the Daily Log or to perform a manual, on-site search of the

copies of the Inventory Reports to determine whether the vehicle is, in fact, at Pound 6. If a search of

the Daily Log or Inventory Reports is unsuccessful, the Pound supervisor is required to conduct a

physical search of the Pound with the owner to locate the vehicle.

In addition, the Automotive Pound section of the Police Department, which maintains the Tow

Reports and Inventory Reports, is required, when an owner cannot locate their vehicle, to search the

Inventory Report to attempt to locate the vehicle. It is undisputed that these procedures were not used in attempting to locate Plaintiffs' Moore and Gable's vehicles.

**RELEASE OF VEHICLES TO OWNERS**

Generally, if an owner does not seek a post-tow hearing, he is entitled to release of an impounded vehicle within the time period stated in the Notice by paying for towing and fees and by presenting proper identification and other necessary documentation indicating vehicle ownership. If the vehicle was a Scofflaw or Criminal Tow, the owner must pay the outstanding parking ticket fines or the applicable fines and penalties for the Criminal Tow, as well as the towing and accrued storage fees. These amounts must first be paid at a Department of Revenue facility. The owner then must provide to Pound personnel proof that the amounts have been paid and proper identification and documentation of ownership to obtain the vehicle.

To avoid any conflict with the terms of the Notice, Pound personnel are prohibited from offering any information to owners as to how long they have to redeem their vehicles or from otherwise altering the terms of the Notice mailed by the City. If an owner asks how long the vehicle may remain at the Pound before the City disposes of it, Pound personnel are required to tell the owner to direct his or her inquiries to personnel at S&S or the Chicago Police Department Auto Pound Headquarters, their questions will be answered.

After receipt of the required information and fees, Pound personnel review the Inventory Report, direct the owner to the location of the vehicle within the Pound, and allow the owner to remove the vehicle immediately. Once an owner retrieves her vehicle, the City allows her to document any theft or damage that the owner believes to have occurred while the vehicle was in the City's possession.

11

## DISPOSAL OF UNCLAIMED VEHICLES

If an impounded vehicle remains unclaimed in the Pound beyond the time on the Notice, the City disposes of the vehicle pursuant to the Municipal Code, which allows either the sale of the vehicle for scrap or at auction, or the retention of the vehicle for the City's use. The Municipal Code, however, forbids disposal of impounded vehicles that have not been redeemed until the redemption period in the Notice has elapsed. City personnel at either S&S or the Chicago Police Department are responsible for determining what vehicles were unclaimed and subject to disposal under the Municipal Code, and for directing Pound personnel to dispose of those vehicles. The City identifies vehicles subject to disposal only after it verifies that the required Notice has been mailed.

In particular from 1995 to September 1999, the Chicago Police Department was responsible for determining what vehicles were unclaimed and could be disposed of under the Code, and for directing Pound personnel to dispose of such vehicles. The Chicago Police Department made this determination as to vehicle disposition only after it verified for each vehicle to be disposed of that the required Notice had been sent out as required under the Code. After September 1999 S&S took over responsibility for determining what vehicles should be disposed of and it, similarly, makes this determination only after it verifies for each vehicle to be disposed that the required Notice has been sent out as required by the Code.

The Chicago Police Department maintains copies of all Tow Reports, Discrepancy Reports, and Inventory Reports for every vehicle towed by the City. In addition, it keeps copies of all Notices that it has sent out to vehicle owners. The Police Department's Policy is to maintain these records for at least one year after the vehicle has been redeemed or disposed of. The Police Department periodically destroys such records that are older. Prior to destroying any such documents, the Chicago

Police Department first petitions the State Archives in Springfield Illinois for permission to destroy documents. The last time the Police Department destroyed tow documents pursuant to this policy was in May 1997. At this time, the Chicago Police Department destroyed all tow document for vehicles towed through January 1996. Thus, with one exception the Police Department currently maintains tow documents for vehicles towed after the middle of January 1996. The Department of Revenue maintains copies of all Notices for all vehicles subject to Criminal Tows. The Department of Revenue's retention policy for these documents is five years.

It is undisputed that Greg Moore's car was destroyed 30 days after towing; during that time it is undisputed that he was misinformed that his car was not at Pound 6. Furthermore, Moore did not receive Notice from the City because he had moved without filing a change of address with the Secretary of State. Gladney admits she received and reviewed a written notice dated August 6, 1996, that her car would be disposed of is she did not pay the nearly $2,000 in parking tickets she owed within 30 days. The car was subsequently disposed of on September 6, 1996.

**THEFT AND DAMAGE AT Pound 6**

Owners of impounded vehicles have claimed that, after a tow and while in possession of the City, their vehicles either sustained damage ("Damage Claim") or theft of personal property ("Theft Claim") (collectively, "Claims"). Since 1995, the percentage of such Claims at Pound 6 represents approximately one percent of the total number (1,400/1 82,000) of vehicles towed there. Since EAR assumed control of Pound 6, the number of Claims has decreased substantially. In 1998 and 1999, the number of EAR Claim Forms filed was 231 and 175, respectively, while the number of vehicles towed to Pound 6 for those years was 41,124 and 41,807, respectively.

From at least 1995 to October 1997, when the City operated Pound 6, it used a "Discrepancy

Report" to allow the owner to document alleged damage or theft. The Discrepancy Report was completed by Pound personnel at the request of the owner. The Pound employee completing the Discrepancy Report was required to verify (1) that the alleged damage accurately reflected the damage to the vehicle when the Discrepancy Report was completed, and (2) that any property allegedly stolen was not in the vehicle when the Discrepancy Report was completed. However, Pound personnel completing the Discrepancy Report did not verify whether the damage or theft occurred before or after the vehicle was towed. Nor did Pound personnel verify that the allegedly stolen property was in the vehicle when the City towed it. When EAR assumed control of Pound 6, it eliminated the use of the Discrepancy Report and instead allowed vehicle owners to complete a document entitled "Environmental Auto Removal Claim Form ("EAR Claim Form")" to document alleged property damage or theft.

The fact that over a thousand Plaintiffs' cars were damaged and numerous possessions stolen from these cars is undisputed. Plaintiff Gene Floriani arrived at Pound 6 to find his vehicle stripped, sitting in the mud, it had no tires or rims and the radio was missing. When Plaintiff Ralph Bennett went to retrieve his car the trunk lock was popped, the trunk was wide-open, all personal property inside the trunk was gone, the door panels were unhinged from the doors, and the backseat ripped out. Plaintiff Anthony Brown had two amplifiers and two Boom Tube speakers, numerous compact discs and a tape player stolen from his car. When Plaintiff Melinda Diamond found her car it was resting on the gravel blocking an aisle in the Pound. It was missing its wheels and tires, the right window was broken, all seat belts were slashed, the front seat was slashed, the radio was missing, the steering wheel was slashed, the dashboard severely damaged and there was damage to the front end and rear end of the car. She later discovered that the battery had been stolen from the car, the antenna

was missing, the airbag stolen and other miscellaneous damage. When Christopher Fiedor went to retrieve his car, he discovered the driver's side window was broken, the bumper broken, the head light broken, door panel torn out, front fender damaged, and the front and rear wheels damaged. When Plaintiff Robert Figiel went to retrieve his car at Pound 6 the front bumper was damage, the rear passenger door was broken and all personal property stolen.

When Scott Gremillion retrieve his car at the Pound he observed that every car surrounding his at Pound 6 had been broken into. The trunk of his car was wide open, and the trunk lock broken. Windows had been broken and all items of value stolen including an air compressor, a drill and charger, a work light, and various mechanical tools. Plaintiff Nettie Croom found her car damaged with both the radio and CD player stolen, two 15 inch subwoofers in a box were stolen, the sun roof was damaged, the electric rear view mirror was broken, the front light were broken, the rear windshield wipers were broken, and the entire music system gone. Andrew Jackson's car was totally inoperable when he arrived at Pound 6. The oil pan, engine and exhaust system were all completely destroyed and he had to have the engine rebuilt. Christopher Jackson's car had all four wheels missing, substantial damage to the vehicle and a radio, CD changer, two audio speakers, two car phones, one toolbox, two videotape movies, 200 compact discs, one baby car seat, and boots and shoes stolen. Tommy Jackson's CD player and boom box were stolen, two amplifiers and damage to the car. Eleven other Plaintiffs have submitted affidavits describing similar theft and damage to their vehicles.

## CAUSES OF THEFT AND DAMAGE

The City alleges there are two primary causes of theft and damage. First, some of the damage claims were simply accidentally or negligently caused by the towing and impoundment operations themselves. For example, towed vehicles are occasionally damaged while being initially hoisted by

15

the tow truck, while being transported to the Pound, while being placed in the Pound, and while being moved within the Pound.

The Theft Claims (and related vandalism), of course, are not accidentally caused. As for the Theft Claims arising from Pound 6, the City claims that most of the theft and damage is caused by third parties who trespass into the Pound and break into, and steal from, the vehicles ("Third Parties"). The City points to the following undisputed evidence. First, on numerous occasions from 1995 to the present, Chicago Police Department officers patrolling near, or conducting surveillance at Pound 6 have either observed Third Parties entering Pound 6 to steal or have actually caught Third Parties stealing from impounded vehicles. Furthermore, Pound personnel have also personally observed and caught on numerous occasions Third Parties stealing from or damaging impounded vehicles. The incident reports prepared by EAR concerning such theft or vandalism also reflect that such crime is done by Third Parties. For instance, on numerous occasions from 1995 to the present, Chicago Police Department officials patrolling near or conducting surveillance at the Pound have either observed Third Parties entering the Pound premises to steal or have actually caught Third Parties stealing from vehicles within the Pound. In addition, General Offense Case Reports prepared regarding theft or vandalism at the Pound reflect that crime results from Third Parties. Incident reports prepared by EAR personnel reflect that crime results from Third Parties and that EAR personnel have discovered cuts in the fence surrounding the Pound.

Finally, given the layout of Pound 6, the City claims it is difficult for Pound employees to actually stash stolen property of any size away in their vehicles. Pound personnel are required to park their vehicles in a lot adjacent to the Pound Office, where the Pound supervisor, other Pound personnel and the security guard frequently congregate. Since 1995, there have only been two incidents in which

Pound personnel have been caught stealing from vehicles impounded at Pound 6. These thieves were immediately fired.

Plaintiffs dispute that Third Parties are responsible for the theft and damage given the circumstances of the thefts as described in Plaintiffs' declarations. Plaintiffs contend it would be virtually impossible for anyone but Pound employees to carry out the theft and damage complained of. Plaintiffs further argue that the items stolen from the cars were too heavy and burdensome to be carried away.

## EFFORTS TO STOP THEFT AND DAMAGE

Since at least 1995, the City and EAR have made efforts to eliminate, to the extent practicable, the number of Claims arising from the City's towing and impounding practices at Pound 6. Based upon its understanding that the overwhelming majority of thefts were caused by Third Parties, the City's primary efforts were directed towards preventing Third Parties from unlawfully entering the Pound and stealing and vandalizing vehicles. For example, beginning in at least 1995, Chicago Police Department officers from the 13th District have conducted routine surveillance at Pound 6 in an attempt to apprehend thieves. Chicago Police Department officers from the 13th District were also consistently ordered to patrol the area surrounding Pound 6. Furthermore, Pound employees were required to check the fencing at Pound 6 every morning for any evidence of unlawful entry and to immediately repair any damage to the fence. And since 1994, police officials from the 13th District who regularly patrol and conduct surveillance are not aware of a single incident in which a City or EAR employee has been observed, or arrested for, stealing or vandalizing.

One of the primary reasons that the City decided to privatize the operation of Pound 6 was its hope that EAR could minimize what theft and vandalism that does occur. Indeed, the Contract

expressly requires EAR to "take all necessary precautions to avoid any damage or injury to persons or property, including without limitation City property, any towed Vehicle and any personal property in the Vehicle." Accordingly, when EAR began managing Pound 6, it made numerous efforts to minimize, to the extent practicable, theft and damage of impounded vehicles.

EAR's Employee Handbook ("Handbook"), which is given to each employee, is one example of these efforts, as it describes EAR's many policies concerning vehicle damage and theft. Pursuant to these policies, EAR performs periodic, random inspections of its employees' vehicles to ensure that they are not removing stolen property from Pound 6. EAR also consistently inspects tow trucks when they enter and exit Pound 6 to ensure that no property is being unlawfully removed.

Furthermore, EAR added numerous security measures to minimize damage and theft from Third Parties. For example, within the existing Pound fence, EAR erected a dog run, in which eight dogs (a mix of Rottweiler and German Shepard) are allowed to run 24 hours a day to catch and deter trespassers. Moreover, even in areas where there is no fencing, EAR requires a guard and dog team to roam inside the Pound daily from dusk to sunrise. Finally, EAR hires off-duty CPD officers to provide security at certain times of the day. Despite the above efforts it is undisputed that the incidences of damage and theft continue to occur.

**RESOLUTION OF CLAIMS**

The City provides an administrative claims process that is equipped to investigate and resolve all Damage and Theft Claim arising out of the City's towing and impoundment of vehicles. From 1995 until EAR assumed control of Pound 6 in 1997, a person alleging damage or theft claim against the City could file a claim form with the City Clerk's office. Once a claim is submitted, an investigator examines the factual circumstances and any documents submitted to determine whether the City is

liable for the damage, and if so, the proper amount the City should pay. Based upon this investigation, efforts are then made to resolve the claim. Additionally, the Contract with EAR requires EAR to attempt to resolve all property damage claims, and requires it to "act on all claims by the public in good faith in a reasonable and expeditious manner." When a vehicle owner retrieves his or her car from the Pound, he is allowed to complete a document entitle "Environmental Auto Removal Claim Form" to document the claimed property damage or theft he believes to have occurred after the vehicle was towed.

Pursuant to this provision, EAR has established an informal claims process to attempt to resolve good faith property damage or theft claims. Many of the claims submitted to EAR have been denied for a variety of reasons, including: (1) because the relevant documents establish the damage occurred before the vehicle was towed; (2) because the claimant cannot adequately document the property theft alleged; (3) because the property theft alleged is simply not credible; and (4) because claimants often attempt to obtain compensation in an amount that far exceeds the amount of damage to their vehicle. In addition, for many of the claims, EAR has attempted to settle, but it has been unable to do so because the claimant rejects EAR's settlement offer. EAR then investigates the claim. Since EAR began operation of Pound 6 in 1997 through the end of 1999, it has received 421 claims and has settled 108 of them.

Plaintiffs disputes that neither the City or EAR investigated Plaintiffs' claims or attempted to resolve them in good faith. Plaintiffs point out that there is no evidence that any of the Plaintiffs were ever investigated, i.e. no notes that their claims were in fact investigated. Plaintiffs admit that named Plaintiff Jo Ellen Desautels settled her claim, Andrew Jackson was offered a settlement and Christopher Jackson's insurance company settled with the City.

## PLAINTIFFS' CLASS ACTION CLAIMS

Plaintiffs argue that the City deprived them, and other similarly situated individuals, of their property without due process of law through the following customs at Pound 6:

 a. the City has a custom or policy of failing to timely notify vehicle owners that their cars have been towed to Pound 6;

 b. the City has a custom or policy of denying to vehicle owners that their vehicles are present at Pound 6, even though its agents knew or should have know that the vehicles are in fact at the facility;

 c. the City, through its agents, has systematically broken into and entered vehicles towed to Pound 6, and has converted and stolen personal property from the vehicles of class members;

 d. the City, through its agents, has systematically compacted and destroyed the vehicles of Plaintiffs towed to Pound 6 without notice to the owners, often in an attempt to cover up the theft and vandalism done to the vehicles;

 e. the City has allowed the policy or custom of theft, vandalism, destruction, and failure of notice to continue at Pound 6 despite constant complaints made by Plaintiffs to the Police Department as well as written reports to the City and its agents.

Plaintiffs seek summary judgment on grounds (b) through (e) claiming that there are material issues of fact as to the notices received by Plaintiffs. Plaintiffs claim that there are too many instances in which the City claims to have sent notices, but the Class members denied having received the notices, raising factual issues of credibility and the reasonableness of the City's attempt to notify class members.

The City, in turn, has cross moved for summary judgment on all of Plaintiffs' claims arguing that Plaintiffs cannot establish, legally or factually, a violation of their procedural or substantive due process rights; and in any event Plaintiffs fail to raise a genuine issue of material fact that the City as a municipality is liable for the damage and theft to their cars. The City contends that Plaintiffs' claims under the Due Process Clause are defective because they have completely failed to raise issues of fact

which support their contention that state action deprived them of their property, and that post deprivation remedies under Illinois law provided them with all due process due.

## III.  DISCUSSION

Summary judgment is appropriate if the pleadings, answers to interrogatories, admission, affidavits and other materials show that "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(b). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).  The party seeking summary judgment carries the initial burden of showing that no such issue of material fact exists.  Pursuant to Rule 56(b), when a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue of material fact and that the moving party is not entitled to judgment as a matter of law. *See Anderson,* 477 U.S. at 250.

In making our determination, we are to draw inferences from the record in a light most favorable to the non-moving party.  We are not required to draw every conceivable inference, but only those that are reasonable. *See DeValk Lincoln Mercury, Inc. v. Ford Motor Co.,* 811 F. 2d 326, 329 (7th Cir. 1987).  The nonmovant may not rest upon mere allegations in the pleadings or upon conclusory statements in affidavits; rather, the party must go beyond the pleadings and support his contentions with proper documentary evidence. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986).  Rule 56 mandates the entry of summary judgment against a party who fails to establish the existence of an element essential to that party's cause of action. *See Celotex,* 477 U.S. at 422.

For cross-motions for summary judgment, each movant must individually fulfill the stringent requirements necessary to obtain summary judgment under Rule 56, such standards still being applicable. *United v. Ill. Central R.R.,* 998 F. Supp. 874, 880(N.D. Ill. 1998). By filing cross-motions for summary judgment the parties do not waive trial, unless the judge disagrees. *Miller v. LeSea Broadcasting, Inc.* 87 F. 3d 224, 230 (7th Cir. 1996). Indeed upon cross motions for summary judgment, the court is not required to grant summary judgment as a matter of law for either side. *Brownlee v. City of Chicago,* 983 F. Supp. 776, 779 (N.D. Ill. 1997). Rather, the court will evaluate each motion on its merits, resolving factual uncertainties and drawing all reasonable inferences against the movant. *Brownlee,* 983 F. Supp. at 779. With these principles in mind, we turn to the merits of the motions.

## MOTION TO STRIKE

The City's motion to strike a number of Plaintiffs' responses to the City's Local Rule 56.1 statement as well as to strike the affidavit of Plaintiffs' counsel is hereby denied. While the City's arguments with respect to Plaintiffs' failure to comply with Local Rule 56.1's requirements may be well taken, the resolution of this issue is not necessary to the resolution of the motions before us. In the interest of fairness we shall exercise our discretion in favor of considering the facts Plaintiffs offer in support of their arguments despite counsel's failure to comply with Local Rule 56.1's requirements. Plaintiffs' motion to strike portions of the City's 56.1 statement is granted.

## PLAINTIFFS' *MONELL* CLAIM

Under the decisions of the Supreme Court and this court, municipal liability under section 1983 requires proof of three elements: a policymaker; an official policy; and a violation of constitutional rights whose "moving force" is the policy or custom. *Monell v. Dep't of Social Services,* 436 U.S. 658,

694, 98 S. Ct. 2018, 2037, 56 L. Ed. 611 (1978). There are three recognized contexts in which a

municipality or other local governing body can be sued under § 1983:

> (1) for an express policy that causes a constitutional deprivation; (2) for a widespread practice that, although not authorized by written law or express municipal policy, causes a constitutional deprivation, and is so permanent and well settled as to constitute a custom and usage with the force of law; or (3) for an allegation that the constitutional injury was caused by a person with "final policymaking authority."

*Baxter by Baxter v. Vigo County School Corp.,* 26 F. 3d 728, 735 (7th Cir. 1994).

*Monell* and later decisions reject municipal liability predicated on respondeat superior. *Bd. of*

*Comm'rs of Bryan County v. Brown,* 520 U.S. 397, 403, 117 S. Ct. 1382, 1388, 137 L. Ed. 2d 626

(1997). Thus, a municipality may not be sued under § 1983 for the acts of others but, rather, only for

its own acts. *See Monell v. Dept. of Social Serv.,* 436 U.S. 658, 691-94, 98 S. Ct. 2018, 56 L. Ed.

611(1978). The viability of a § 1983 action against a governmental body rests on an allegation that the

execution of the local governmental body's "official policy" itself results in a deprivation of a

constitutionally protected right. *See Monell,* 436 U.S. at 694. Consequently, the unconstitutional

conduct must be directly attributable to the municipality through some sort of official action or

imprimatur; isolated unconstitutional actions by municipal employees will almost never trigger

liability. *Bennett v. City of Slidell,* 728 F. 2d 762, 768 n.3 (5th Cir. 1984), *cert. denied* 472 U.S. 1016,

105 S. Ct. 3476, 87 L. Ed. 2d 612 (1985).

The three elements described in *Monell*–a policymaker, an official policy and the "moving

force" of the policy–are necessary to distinguish individual violations perpetrated by local government

employees from those which can be fairly identified as actions of the government itself. *Bryan County*

underscores the need for *Monell* plaintiffs to establish both the causal link ("moving force") and the

City's degree of culpability ("deliberate indifference') to federally protected rights. These

requirements must not be diluted, for "[w]here a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into respondeat superior liability." *Bryan County,* 520 U.S. at 410, 117 S. Ct. at 1394.

Plaintiffs identify the alleged municipal policymaker in this case to be the City. The City does not dispute that it is a policymaker for purposes of potential liability. The City denies liability under Section 1983 arguing that the Plaintiffs have "put the cart before the horse" because they cannot establish factually or legally, that the City violated their due process rights, and because Plaintiffs have failed to submit any evidence that a municipal policy cause the alleged due process violations.

While an unconstitutional official policy renders a municipality culpable under § 1983, even a facially innocuous policy will support liability if it was promulgated with deliberate indifference to the "known or obvious consequences" that constitutional violations would result. *Bryan County,* 520 U.S. at 407, 117 S. Ct. at 1389, 1390. Deliberate indifference of this sort is a stringent test, and "a showing of simple or even heightened negligence will not suffice" to prove municipal culpability. *See id.* In addition to culpability, there must be a direct causal link between the municipal policy and the constitutional deprivation. *Monell* describes the high threshold of proof by stating that the policy must be the "moving force" behind the violation. *Monell,* 436 U.S. at 694, 98 S. Ct. at 2037-2038. "Isolated violations are not persistent, constant violations, that constitute custom and policy as required for municipal section 1983 liability." *Bennett v. City of Slidell,* 728 F. 2d 762, 768 n. 3 (5th Cir. 1984), *cert. denied,* 472 U.S. 1016, 105 S. Ct. 3476, 87 L. Ed. 2d 612 (1985).

The City denies that any policy or custom is tied to the destruction, damage and theft of Plaintiffs' vehicles arguing that a regular system is in place which gives vehicle owners notice that their vehicle has been towed and, if damaged, an opportunity to be heard as to the damages. The City

argues that even taken together, the alleged policies express no single municipal policy but only a series of adversarial conclusions, the factual support of which is insufficient for purposes of surviving summary judgment.

There are many problems with Plaintiffs' case. Plaintiffs have failed to develop the evidence in this case or to apply this evidence to the elements of *Monell*. Furthermore, Plaintiffs' briefs in support of summary judgment and in opposition to the City's request for summary judgment fail completely to discuss the case law. Plaintiffs motion for summary judgment relies solely on the language set forth in Judge Kocoras' decisions with respect to class certification and dismissal. But Judge Kocoras' analyses in these decisions were not meant to apply in the content of cross motions for summary judgment. Rather, Judge Kocoras was applying the standard for motions to dismiss and class certification which required him to take as true the facts set forth in Plaintiff's Complaint.

Turning to Plaintiffs' first two arguments that the City has a custom or practice of failing to timely notify vehicle owners that their cars have been towed to Pound 6 and has a custom of denying to vehicle owners that their vehicles are present at Pound 6, we find that Plaintiffs' alleged custom or practice fails for lack of evidence. Plaintiffs primarily rely on the affidavits of class members Casey Gable, Greg Moore and Gene Florani and Brian Johnson. It is undisputed that all three Plaintiffs, after their cars were towed, contacted the Pound 6 and were told that their vehicles were not there. While this Court has no doubt that Plaintiffs' did in fact experience what they describe in their affidavits these facts taken as a true are insufficient to support an alleged custom on the part of the City under *Monell*.

It is undisputed that the use of an automobile constitutes a protected property interest under 42 U.S.C. § 1983, *Sutton v. City of Milwaukee,* 672 F. 2d 644, 645 (7th Cir. 1982). However, it is also

undisputed that the City has a policy in place which mandates the notice procedures to be followed when vehicles are towed. *Muni Code § 9-92-070(a),(b); §2-14-132; 9-92-100.* The limited incidences that Plaintiffs have offered as evidence that a different unwritten custom exists when cars are towed to Pound 6 are too sporadic in nature to support the conclusion that such a custom exists with respect to Pound 6 and that City personnel were the moving force behind this custom or practice. The City has offered unrebutted deposition testimony which establishes that in Johnson's case, what the Pound stated, was the car was not there yet. In Fioriani's case a police officer called him two days later to let him know his car was in fact there and in Moore and Gables' cases it appears that incorrect information may have been entered into the system. This at the most constitutes negligence on the City's part.

Furthermore, we find that the City has produced unrebutted evidence that the City sent each of these Plaintiffs the required notice which indicted the Pound location and the vehicles Inventory Number. Plaintiffs have all conceded that they changed addresses without notifying the Secretary of State. To be sure, in one instance the notice had a misspelling of the otherwise correctly designated street and was returned by the post office but this one incident is insufficient to support a custom claim under *Monell*. Human error, clerical mistakes or a delay in processing information is not facially unconstitutional. Accordingly, the Court finds that these incidences fail to show a widespread custom of denying to owners the fact that their vehicles have been towed or giving notice of the tow.

Turning next to Plaintiffs' third argument, that the City has a custom of systematically breaking into and stealing from cars towed to Pound 6, we conclude that the evidence offered by Plaintiffs is insufficient, even from a circumstantial standpoint, to support their contention that City personnel are committing the damage and theft. Plaintiffs have submitted approximately 24 affidavits detailing the

damage and theft done to their cars. Once again we have no doubt that this damage and theft occurred. Plaintiffs claim that Pound 6 has operated as nothing less than a Chop Shop run by City employees and it was not possible for City authorities to have been unaware of the ongoing criminal enterprise operating at Pound 6 but rather turned a blind eye to such. Plaintiffs argue that the City has in fact made it virtually impossible for third parties to break into the Pound and the nature of the items being stolen from Plaintiffs' cars raise an inference of fact that City personnel are responsible for the theft and damage. We find this speculation standing alone insufficient to support Plaintiffs' claims that City personnel were involved. At this stage of the litigation *Monell* requires Plaintiffs to do more than speculate.

The City offers substantial evidence that the damage and theft done to the cars has in some instances been caused by private criminal trespassers.[1] The City by affidavit admits that for the period of time involved there have been at most three instances where City employees were caught stealing from cars towed to Pound 6 and in each case these employees were terminated. Plaintiffs offer absolutely no evidence to support their allegation that City personnel committed the theft and damage.

Plaintiffs have not taken the depositions of any of the people who work or formally worked at the Pound, the Police Officers responsible for supervising the Pound, the tow truck drivers responsible for towing cars to the Pound nor do they offer any other independent evidence raising issues of fact that City personnel were involved. The City produced the time sheets of personnel working at Pound 6

---

[1] This evidence includes the following: Affidavits of the City's General Manager of the Pound, Steve Sorfleet; EAR's Assistant General Manger, Joe Braverman; Sergeant Donald Sobczak, the Supervising Sergeant of the Automotive Pound Section of the Chicago Police Department; Lieutenant Kevin Dillon, the Watch Commander for the 13th District; (the District the Pound is located in) Officer John Kotlarz, the midnight shift officer of the 13th District; EAR's internal theft reports; 35 police reports involving the burglarizing of vehicles at Pound 6; and reports where owners of the vehicles were caught damaging their own cars.

as well as information as to the Police Officials responsible for the Automobile Pound Section of the Chicago Police Department. The only evidence offered by Plaintiffs are their self-serving affidavits which essentially speculate that the theft and damage was done by City employees. Furthermore, the items stolen from Plaintiffs vehicles are not dissimilar to items recovered by Chicago Police Officers when arresting Third Party trespassers as evidenced in the police reports. Thus, Plaintiffs' affidavits are insufficient with respect to their allegations that Pound personnel had a custom of breaking into and damaging their vehicles. Even if we were to take Plaintiffs' affidavits as true this speculation is still insufficient to raise an inference as to Plaintiffs' custom argument because Plaintiffs 1400 claims constitute less than 1% of the towed vehicles. This record fails to support an inference that City personnel are committing the theft and damage of automobiles at Pound 6.

As the Supreme Court has explained, "nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors." *DeShaney V. Winnebago County Dep't of Social Servs,* 489 U.S. 189, 195, 109 S.Ct. 998, 1003,103 L.Ed. 2d 249 (1989). The Due Process Clause is not "an affirmative charter of governmental duties." *J.O.Alton Community Unite School Dist.,* 909 F. 2d 267, 272 (7th Cir. 1990). Thus, "the due process clause is not a 'guarantee of certain minimal levels of safety and security.'" *Id. (quoting DeShaney,* 489 U.S. 189) *Collins v. City of Harker Hts., Tex.,* 503 U.S. 115, 128 , 112 S. Ct. 1061, 117 L.Ed. 2d 261 (1992); *Davidson v. Cannon,* 474 U.S. 344, 347-48, 106 S.Ct. 668, 88 L.Ed..2d 677 (1986); *Kitzman-Kelley v. Warner,* 203 F. 3d 454, 457 (7th Cir. 2000). Moreover, "Section 1983 imposes liability for violations of rights protected by the Constitution not for violations of duties of care arising out of tort law." *Baker v. McCollan,* 443 U.S. 137, 146, 99 S. Ct. 2689, 61 L.Ed. 2d 433 (1979). Indeed, "[f]ederal courts do not enforce state law by characterizing violations of state law as

offenses against the Constitution." *Saukstelis v. City of Chicago,* 932 F. 2d 1171, 1174 (7th Cir. 1991); *see also Paul v. Davis,* 424 U.S. 693, 701, 96 S.Ct. 1155, 47 L.Ed. 2d 405 (1976) (stating that the Fourteenth Amendment should not be made a font of tort law).

The Seventh Circuit has recognized only two exceptions to the above principal that a governmental unit can be held liable for its inactions. Both exceptions involve situations where there exists a "special relationship between the state and an individual: (1) the obligation to provide medical care to prisoners and involuntarily-committed mental patients; and (2) the obligation to protect individuals from dangerous situations that are created or exacerbated by the state. *See Kitzman-Kelley,* 203 F. 3d at 458, *Estate of Stevens v. City of Green Bay,* 105 F. 3d 1169, 1174 (7th Cir. 1997). Because Plaintiffs' claims involve property, neither of these exceptions applies here. At most, Plaintiffs' complaints amount to tort claims of negligent supervision or bailment against the City. *See, e.g., American Ambassador Cas. Co. v. City of Chicago,* 205 Ill. App. 3d 879, 883, 563, N. E. 2d 882, 150 Ill. Dec.755 (1st Dist. 1990).

Finelly, the core of due process is the right to notice and a meaningful opportunity to be heard. *LaChance v. Erickson,* 522 U.S. 262, 266, 118 S. Ct. 753, 139 L.Ed. 2d 695 (1998). However, "[d]ue process, the Supreme Court has repeatedly written, is a flexible concept that varies with the particular situation." *Doherty v. City of Chicago,* 75 F. 3d 318, 323 (7th Cir. 1995). Indeed, because pre-deprivation process is not always feasible, the Supreme Court has held that post-deprivation remedies may provide all the process that is due. *Taylor v. Parratt,* 451 U.S. 527, 540-41, 101 S.Ct. 1908, 68 L.Ed. 2d 420. This is so because "[t]he constitutional violation under §1983 is not complete when the deprivation occurs; unless and until the State fails to provide due process." *Zinermon v. Burch,* 494 U.S. 113, 126 (1980). "The controlling inquiry is solely whether the state is in a position to provide for

pre-deprivation process." *Hudson v. Palmer,* 468 U.S. 517, 534, 104 S.Ct. 3194, 82 L.Ed. 2d 343

(1984).

Here, since the record fails to establish acts by City personnel there is absolutely no way the

City could have provided pre-deprivation process to Plaintiffs for the alleged crimes of theft and

vandalism to their vehicles. Thus, the only process that Plaintiff are conceivably entitled to is post-

deprivation. *See, Doherty,* 75 F. 3d at 323. To that end, "there is no denial of due process if a plaintiff

is seeking a post-deprivation remedy for loss of property resulting from a random and unauthorized act

of a governmental official, and if the state provides an adequate post-deprivation remedy." *Ernst v.*

*City of Chicago,* 63 F. Supp. 2d 908, 912 (N.D. Ill. 1999)(*citing Parratt,* 451 U.S. at 543-44). The

existence of a post-deprivation action for bailment, conversion or trespass to chattel under Illinois law

provides Plaintiffs with all the process due in these circumstances. *See Ernst,* 63 F. Supp. 2d at

912(*citing American Ambassador Cas. Co.,* 205 Ill. App. 3d at 883.

Plaintiffs contend that the investigation into the damage to their vehicles was purely

formalistic in which little evidence was taken, the file was bare of notes and the conclusions of the

investigator perfunctory. A majority if not all of the Plaintiffs received a denial which stated:

> "Dear Claimant: We have had the opportunity to review your claim and the facts and
> circumstances concerning the claim for damage to your vehicle. Our investigation, as
> substantiated by a police report, motor vehicle inventory, tow driver, and personnel concludes
> that the damage reported was not the result of any action on the part of our company personnel.
> Therefore, your claim is denied."

Even if, as Plaintiffs argue the hearing was in fact purely formalistic because Illinois law

provides for a bailment action in which Plaintiffs could have sued the City for damages for its failure

to keep their cars safely, an adequate post-deprivation remedy is found to exist. Section 1983 was not

meant to supply an exclusive federal remedy for every alleged wrong committed by state officials.

Rather, the statute is a remedy for only those wrongs which offend the Constitution's prohibition against property deprivations without procedural due process. Moreover, Plaintiffs' arguments that the alleged theft and vandalism amounts to a violation of substantive due process is insufficient as a matter of law to survive summary judgment. The Supreme Court has repeatedly emphasized "how limited the scope of the substantive due process doctrine is." *Dunn v. Fairfield,* 158 F. 3d 962, 965 (7th Cir. 1998) (*citing Washington v. Glucksberg,* 521 U.S. 702, 720, 117, S. Ct. 2258, 2266, 138 L.ED.2d 772 (1997). Substantive due process does not come into play when a particular part of the Constitution 'provides an explicit textual source of constitutional protection against a particular sort of governmental behavior. *County of Sacramento v. Lewis,* 523, U.S. 833, 840, 118 S. Ct. 1708, 1714, 140 L.Ed. 2d 1043 (1998). Where property is at issue as opposed to life or liberty, the Seventh Circuit has "expressed disapproval or reservations concerning the application of a substantive due process analysis to a claim based on a state-created property interest." *Polenz v. Parrot,* 883 F. 2d 551, 557 (7th Cir. 1989)(collecting cases); *Wudtke v. Davel* 128 F. 3d 1057, 1062 (7th Cir. 1997). To establish a violation of substantive due process based on a deprivation of property, a Plaintiff must show : (1) that the state's actions were arbitrary and irrational; and (2) that the state committed a separate substantive constitutional violation or that state law remedies are inadequate to remedy the deprivation. *See Wudtke,* 128 F. 3d at 1062. In the instant case, Plaintiffs have failed to raise genuine issues of fact to establish the possibility that their substantive due process rights were violated. Plaintiffs have failed to show state action as well as a separate substantive constitutional violation. Accordingly, the City cannot be held liable under the Due Process Clause.

Plaintiffs fourth argument in support of summary judgment puts forth that the City, through its agents, has systematically compacted and destroyed the vehicles of class members towed to Pound 6.

While it is undisputed that some cars were destroyed by the City it is also undisputed that Plaintiffs have offered evidence that this happened only on two occasions. These limited instances cannot be concluded to be a custom or practice of the City .

## CONCLUSION

For the reasons set forth above defendant's motion to strike is denied (#63-1), Plaintiffs' motion to strike is granted (#70-1), Plaintiffs' motion for summary judgment is denied(#53-1) and Defendant's cross motion for summary judgment granted (#59-1). Judgment is entered in favor of Defendant. The captioned case is hereby ordered terminated upon the docket record of the United States District Court for the Northern District Division.

**SO ORDERED**

ENTERED:

HON. RONALD A. GUZMAN
**United States Judge**